UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Prairie Island Indian Community,

Plaintiff,

v.

Bruce C. Babbitt, Secretary,
United States Department of Interior,

Defendant,

v.

The Sokaogon Chippewa Community (Mole Lake Band of Lake Superior Chippewa), the Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wisconsin, and the Red Cliff Band of Lake Superior Chippewa Indians of Wisconsin,

Intervenor-Defendants.

Civil File No. 00-1662 (PAM/JGL)

**MEMORANDUM AND ORDER**

---

This matter is before the Court upon Plaintiff's Motion for Preliminary Injunction and Defendant's Motion to Dismiss. For the following reasons, the Court denies both motions.

**BACKGROUND**

In 1988, Congress enacted the Indian Gaming Regulatory Act ("IGRA") to "provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal

FILED NOV 0 2 2000
FRANCIS E. DOSAL, CLERK
JUDGMENT ENTD
DEPUTY CLERK

economic development, self-sufficiency, and strong tribal governments."[1] 25 U.S.C. § 2702(1). Under federal law, the Secretary of the Department of the Interior (the "Secretary") may acquire land in trust for the benefit of an Indian tribe. See 25 U.S.C. § 465. Under IGRA, the land acquired may serve as the site for a gaming facility if the Secretary determines that a gaming establishment on the newly acquired lands would be in the best interest of the Indian tribe and its members, and would not be detrimental to the surrounding community. See 25 U.S.C. § 2719(b)(1)(A). In making such a determination, the Secretary is required to consult with the applicant tribe and appropriate State and local officials, including officials of other nearby Indian tribes. See id. This provision ensures that the rights and needs of the applicant tribe are balanced with the competitive economic interests of neighboring tribes, as well as the State. See S. Rep. No. 100-446, at 2 (1988), reprinted in 1988 U.S.C.C.A.N. 3071. If the Secretary makes a favorable determination, the application will be approved only "if the Governor of the State in which the gaming activity

---

[1] Interestingly,

> [d]espite this lofty declaration, most commentators agree that the major impetus behind IGRA's enactment was state fear of competition from both regulated and unregulated Indian gaming. As one scholar has noted, the Indian gaming controversy 'demonstrates that when it comes to state-tribal politics, it is still cowboys versus Indians.'

Kathryn R.L. Rand & Steven A. Light, Virtue or Vice? How IGRA Shapes the Politics of Native American Gaming, Sovereignty, and Identity, 4 VA. J. SOC. POL'Y & L. 381, 399 (1997).

is to be conducted concurs in the Secretary's determination." Id. If the Governor so concurs, the Secretary must publish notice of the decision to take the land into trust. See 25 C.F.R. 151.12(b). Actual acquisition of the land may occur 30 days following the publication of such notice. See id.

In October 1993, the Sokaogon Chippewa Community (Mole Lake Band of Lake Superior Chippewa), the Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wisconsin, and the Red Cliff Band of Lake Superior Chippewa Indians of Wisconsin (the "applicant tribes") applied to the Department of the Interior's Bureau of Indian Affairs under IGRA for permission to operate an off-reservation gaming casino in Hudson, Wisconsin. On July 14, 1995, after undergoing IGRA's required analysis, the Secretary denied the application, specifically finding that the new casino would have a detrimental impact on the surrounding communities and would cause irreparable economic injury to existing nearby Indian gaming casinos. The applicant tribes sued in the Western District of Wisconsin, alleging that the Secretary's decision was rife with procedural and substantive defects. In November 1999, after four years of extremely contentious litigation,[2] the parties entered into a settlement agreement in which the Secretary agreed to reconsider the application.

---

[2] The litigation was actually stayed for part of this four year period pending the conclusion of an independent counsel investigation into alleged ex parte communications between the Department of the Interior and tribal officials. See Sokaogon Chippewa Community v. Babbitt, 214 F.3d 941, 944 (7th Cir. 2000). While awaiting the outcome of the investigation, the Secretary and the applicant tribes began negotiating a settlement. See id.

The settlement agreement explicitly sets forth the process by which the application is to be reconsidered. In particular, the Secretary is required to use the existing record supplemented by information from the applicant tribes. The Secretary is permitted to consult with other tribes only to the extent that the information provided directly relates to compliance with the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq. Concerned with this limitation, the St. Croix Chippewa Indians of Wisconsin (the "St. Croix"), owners and operators of a gaming casino approximately 50 miles from the proposed Hudson casino, moved to intervene before the settlement agreement could be approved by the district court.[3] On December 6, 1999, the district court denied the motion to intervene and approved the settlement agreement. The St. Croix appealed and the Seventh Circuit affirmed, finding, most notably, that the tribe lacked standing to directly attack the settlement agreement. See Sokaogon Chippewa Community, 214 F.3d at 948-49.

In June 2000, Plaintiff Prairie Island Indian Community filed this lawsuit challenging the Secretary's decision to forego additional IGRA consultation during reassessment of the application. Plaintiff owns and operates Treasure Island Resort and Casino, an on-reservation gaming facility approximately 40 miles from the proposed site in Hudson. Since opening in 1984, the gaming casino has engendered dramatic positive developments in Plaintiff's self-governance, self-sufficiency, and economic growth and development.

---

[3] The Honorable Barbara B. Crabb, United States District Judge for the Western District of Wisconsin.

Plaintiff fears that if the applicant tribes are permitted to operate a casino in Hudson, those advances will be substantially diminished or perhaps altogether eliminated. On a larger scale, Plaintiff also believes that permitting the Hudson casino to go forward could trigger a "rapid and massive expansion of non-tribal gaming, to the detriment of all Minnesota tribal casinos, as well as tribal casinos in Wisconsin and other neighboring states." (Pl.'s Mem. in Supp. of Mot. for Prelim. Inj. at 11.)

In order to ensure that the Secretary considers these potential negative effects and balances them with the benefits to the applicant tribes, Plaintiff seeks to enforce IGRA's consultation provision. Plaintiff acknowledges that it had the opportunity to consult on the 1994 application and does not dispute that its prior input remains part of the record upon which the Secretary will base his decision. However, Plaintiff asserts that additional consultation is necessary given the 5 year lapse since the initial consultations. According to Plaintiff, the political landscape and the probable effects of granting the application have changed dramatically within that time. In accordance with the settlement agreement, the Secretary has determined that any further consultation with neighboring tribes will occur only through the NEPA process, and not expressly under IGRA.

At the time of the entry of this order, there has been no final determination as to the renewed application. In fact, the Secretary has yet to complete IGRA's first step under which he will determine whether approval of the application would be in the best interest of

the Indian tribe and its members or whether it would be unduly detrimental to the surrounding community.[4]

**DISCUSSION**

**A. Defendant's Motion to Dismiss.[5]**

Defendant moves to dismiss the Complaint, alleging that Plaintiff's claim is not justiciable at this stage in the application process. Because justiciability is "an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of litigation." Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992). Accordingly, the Court takes all facts alleged in Plaintiff's Complaint as true. See Westcott v. Omaha, 901 F.2d 1486, 1488 (8th Cir. 1990). Further, the Court will construe the allegations in the Complaint and reasonable inferences arising from the Complaint favorably to Plaintiff. See Morton v. Becker, 793 F.2d 185, 187 (8th Cir. 1986). Defendant's motion to will be granted only if "it appears beyond doubt that the plaintiff can

---

[4] On July 31, 2000, the Secretary published notice for public comment under NEPA for the proposed gaming casino site. See 65 Fed. Reg. 46730. The comment period closed on August 30, 2000. See id. Although Plaintiff was personally invited by Defendant to comment during that process, it is not clear from the record whether Plaintiff actually chose to do so. (See Def.'s Mem. in Opp'n to Pl.'s Mot. for Prelim. Inj., Ex. F.)

[5] Because it raises the issue of the Court's jurisdiction to hear the case, the Court must consider Defendant's motion to dismiss before turning to Plaintiff's motion on the merits. See Wyoming Outdoor Council v. United States Forest Service, 165 F.3d 43, 47 (D.C. Cir. 1999).

prove no set of facts which would entitle him to relief." Id.; see also Conley v. Gibson, 355 U.S. 41, 45-46 (1957).

1. Standing.

The parties have vastly different perceptions about the injury alleged in this case. According to Defendant, the injury is the socioeconomic decline Plaintiff may experience if and when the land purchase is authorized and applicant tribes' casino is approved and built. Because there are several stages left in the decisionmaking process before such harm could possibly befall Plaintiff, Defendant argues that Plaintiff lacks the kind of concrete non-speculative injury required to meet standing requirements. According to Plaintiff, the injury stems directly from Defendant's decision to deny its procedural right to consultation. Although not unrelated to the injury articulated by Defendant, Plaintiff's alleged injury is distinct. Because Plaintiff's allegations are assessed in the context of a motion to dismiss, the Court will analyze the issue of standing under Plaintiff's claimed injury. The issue, then, is whether Defendant's apparent decision to forego the consultation process upon reconsideration of the application is itself sufficiently injurious to confer standing upon Plaintiff, an intended beneficiary of IGRA's consultation provision. The Court believes that it is.

In order to maintain an action in federal court, all plaintiffs must meet the standing requirements of Article III of the United States Constitution. This is a threshold question in

every federal case, which determines whether a federal court has the power to hear the suit. See Warth v. Seldin, 422 U.S. 490, 498 (1975). Indeed,

> [i]n its constitutional dimension, standing imports justiciability: whether the plaintiff has made out a 'case or controversy' between himself and the defendant within the meaning of Article III. This is the threshold question in every federal case, determining the power of the court to entertain the suit. As an aspect of justiciability, the standing question is whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal court jurisdiction and to justify exercise of the court's remedial powers on his behalf.

Id. at 498-99 (quoting Baker v. Carr, 369 U.S. 186, 204 (1962)).

Article III requires, as an irreducible minimum, that a plaintiff allege (1) an injury in fact, i.e., an invasion of a legally protected interest which is concrete and particularized and actual or imminent, not conjectural or hypothetical; (2) a causal connection between that injury and the complained of conduct; and (3) that the injury is likely to be redressed by a favorable decision. See Defenders of Wildlife, 504 U.S. at 560. Courts have also applied prudential barriers to a plaintiff's quest to establish standing. Most notably, "a plaintiff's grievance must arguably fall within the zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit." Bennett v. Spear, 520 U.S. 154, 164 (1997) (citing Association of Data Processing Serv. Org., Inc. v. Camp, 397 U.S. 150, 153 (1970)); cf. Havens Realty Corp. v. Coleman, 455 U.S. 363, 372 (1982) (noting that courts lack the authority to create prudential limitations to standing where, as in the Fair Housing Act, there is a plain statutory grant of standing).

When the issue of standing revolves around purely procedural rights, the inquiry is somewhat pared down because such rights, according to the Supreme Court, are "special." Defenders of Wildlife, 504 U.S. at 573, n.7. "The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy." Id. Of course, this does not mean that the plaintiff need not establish injury-in-fact, causation, and redressability. See Wyoming Outdoor Council, 165 F.3d at 51. "It only means that the necessary showing to support those minima is reduced." Id. The plaintiff must demonstrate that the procedural violation will cause a "distinct risk to a particularized interest in the plaintiff." Id. Thus,

> one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years.

Defenders of Wildlife, 504 U.S. at 573, n.7. Defendant argues that the Supreme Court's hypothetical actually highlights Plaintiff's lack of injury because while the plaintiffs in the dam scenario face the inevitable consequence of flooding if the dam is built, Plaintiff may or may not face economic injury if the application is approved. Defenders of Wildlife makes clear, however, that procedural injury sufficient for standing is not dependent upon the whether the dam is ultimately built. See id. Rather, the injury lies in the agency's violation of the plaintiff's procedural right, which is designed to protect the threatened concrete

interests of those who would most be affected by the building of the dam. Therefore, the distinction drawn by the Supreme Court is that between the interests of the general public and the interests of those most affected by the proposed dam. See id. Because the general public has no particularized interest in the procedures observed in assessing the propriety of the dam, the general public has no standing to challenge those procedures. See id.

Like those living adjacent to the hypothetical dam, Plaintiff does indeed have a concrete particularized interest in the enforcement of IGRA's consultation provision in this case. As a "nearby Indian tribe," Plaintiff has a congressionally recognized interest in having its competitive economic interests properly balanced with the interests of the applicant tribes.[6] 25 U.S.C. § 2719(b)(1)(A). Notwithstanding the present uncertainty as to the Secretary's final decision on the application, the procedural mechanism designed to ensure such balancing is alleged to have been disregarded. As a result, "the impending threat of injury is sufficiently real to constitute injury-in-fact" under Article III. Wyoming Outdoor Council, 165 F.3d at 51. That this injury may only be fully realized if the application is actually approved does not affect this conclusion. See Defenders of Wildlife, 504 U.S. 573, n.7.

---

[6] In so holding the Court is not suggesting that Plaintiff has a right to be free from competition altogether. Rather, the Court simply recognizes Plaintiff's right under IGRA to have its social and competitive economic interests considered. See 25 U.S.C. § 2719 (b)(1)(a); S. Rep. No. 100-446, at 2 (1988), reprinted in 1988 U.S.C.C.A.N. 3071; see also Settlement Agreement ¶ 8(d). It is Defendant's alleged failure to consider such interests that is the subject of this litigation.

2. Ripeness.

Defendant also argues that Plaintiff's claim is not ripe for judicial review under the Administrative Procedure Act ("APA"), upon which Plaintiff's claim is based. The doctrine of ripeness is designed, in part, to "protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." Ohio Forestry Ass'n, Inc. v. Sierra Club, 523 U.S. 726, 732-33 (1998) (quoting Abbott Lab. v. Gardner, 387 U.S. 136, 148-49 (1967)). The APA explicitly provides that agency action is not ripe for judicial review unless it qualifies as "final agency action." 5 U.S.C. § 704. As explained by the Supreme Court,

> two conditions must be satisfied for agency action to be 'final': First, the action must mark the 'consummation' of the agency's decisionmaking process, it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow[.]'

Bennett v. Spear, 520 U.S. 154, 177-78 (1997) (internal citations omitted).

Although Defendant has not made a final determination as to the application as a whole, he has made clear that there will be no further consultation under IGRA. (See Def.'s Mem. in Opp'n Pl.'s Mot. for Prelim. Inj., Ex. F.) As such, the Court finds that the first prong of Bennett has been met, for there is no possibility that "further agency action will alter the claim in any fashion." Wyoming Outdoor Council, 165 F.3d at 51. In addition, because Defendant's decision directly affects Plaintiff's right to consult on the application, the second prong is also met. Where, as here, a particular procedure is guaranteed by statute, "a person

with standing who is injured by a failure to comply with [that] procedure may complain of that failure at the time the failure takes place, for the claim can never get riper." Ohio Forestry, 523 U.S. at 737.

Having found that Plaintiff's claim is justiciable, the Court now turns to a consideration of Plaintiff's motion.

**B. Plaintiff's Motion for Preliminary Injunction.**

Motions for preliminary injunctions are governed by the four-part test set forth in Dataphase Sys., Inc. v. C.L. Sys., Inc., 640 F.2d 109, 113 (8th Cir. 1981) (en banc). Under the Dataphase standard, four factors are weighed against each other in determining the propriety of issuing preliminary relief: (1) the threat of irreparable harm to the petitioner; (2) the threat of harm to the respondent balanced against the harm to the petitioner; (3) the likelihood that the petitioner will prevail on the merits; and (4) the public interest. See id. "At base, the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." Id.

1. Likelihood of Success on the Merits.

In order to better frame the discussion of the other Dataphase factors, it is best in this case to begin by considering Plaintiff's likelihood of succeeding on its claim that Defendant's decision to forego further consultation under IGRA expressly violates IGRA. In doing so, the Court is of course mindful that a determination as to the likelihood of

success on the merits is "meaningless in isolation." Id. It must be examined "in the context of the relative injuries to the parties and the public." Id. Because Plaintiff's claim is brought under the APA, the Court reviews Defendant's decision to forgo further IGRA consultation to assess whether it may be found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. See 5 U.S.C. § 706(1)(A).

As previously discussed, Defendant is in the process of reassessing the original application, initially filed in 1994. Plaintiff seems to argue that the application currently under consideration is entirely new. A review of the record belies this assertion. Under the terms of the settlement agreement, Defendant expressly agreed to "withdraw and vacate its denial of the plaintiff Tribes' trust application and [to] resume its consideration of the application based on the administrative record already developed by Interior and filed with the U.S. District Court for the Western District of Wisconsin." (Settlement Agreement ¶ 6.) Additionally, the document referred to by Plaintiff as the "new application" is specifically identified as a "letter in support of the Tribes' application to the Secretary of the Interior for approval of our proposed off-reservation gaming facility in Hudson, Wisconsin." (Pl.'s Mem. in Opp'n to Def.'s Mot. to Dismiss, Ex. A.) This distinction is important. If the application were entirely new, Plaintiff would have a much stronger argument that the decision to forego consultation under IGRA was arbitrary and capricious, as doing so would directly contravene the express language of that statute. However, because the current dispute revolves around the consideration of the initial application, for which there is an

extensive administrative record, the Court believes it unlikely that Plaintiff will ultimately prevail on the merits.

Upon reconsideration, Defendant has agreed to allow neighboring tribes, including Plaintiff, to comment under NEPA, rather than under IGRA's consultation provision. Although primarily concerned with potential environmental impact, the NEPA process broadly allows for comment regarding historical, cultural, economic, social, and heath effects, whether direct, indirect, or cumulative. See 40 C.F.R. § 1508.8. Therefore, it is possible that comment under the NEPA process could satisfy IGRA's consultation provision, which is itself undefined. In other words, through the NEPA process, Plaintiff could update and supplement its earlier comments by presenting information regarding the potential negative economic and social effects of the proposed casino.[7] Plaintiff has presented no compelling evidence to suggest that such an opportunity to comment would be insufficient.

Plaintiff does not deny that it had the opportunity to fully consult during the initial application process and that its earlier comments remain part of the record upon which Defendant will base his decision. Nor does Plaintiff deny that it was free to comment during

---

[7] When undergoing IGRA consultation in 1994, Defendant requested input from Plaintiff on the following matters: (1) evidence of environmental impacts and plans for reducing any adverse impacts; (2) impacts on the social structure in the community; (3) impacts on the infrastructure; (4) impact on land use patterns in the surrounding community; (5) impact on the income and employment of the community; (6) additional and existing services required or impacts, costs of additional services to be supplied by the community and source of revenue for doing so; and (7) proposed programs, if any, for compulsive gamblers and the source of funding. (See Def.'s Mem. in Opp'n to Pl.'s Mot. for Prelim. Inj., Ex. A.) These topics could be seen as falling within the scope of NEPA's comment process.

the NEPA process. Given these facts, the Court does not presently believe that Plaintiff will ultimately prevail on its theory that Defendant's decision to forego further consultation under IGRA was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. See 5 U.S.C. § 706(1)(A). This factor therefore weighs in favor or denying injunctive relief.

2. Threat of Irreparable Harm to Plaintiff.

If preliminary relief does not issue, potential harm to Plaintiff certainly exists. Should Defendant be permitted to proceed under the terms of the settlement agreement, the potential detriments to Plaintiff may not be fully considered by Defendant. Nor would the competitive economic interests of Plaintiff and the applicant tribes be properly balanced. However, the Court does not believe that Plaintiff would suffer irreparable injury if preliminary relief is denied at this time. That is, should Plaintiff ultimately prevail on the merits, Defendant could be required to begin the consultation process anew. Accordingly, the Court does not believe that the potential harm to Plaintiff weighs in favor of granting injunctive relief.

3. Balance of Harms.

If the injunction is granted, Defendant faces certain harm. First, if ordered to fully consult with Plaintiff before rendering a decision, Defendant's ultimate decision, which has essentially been pending since 1994, would be further delayed. Furthermore, such an order could encourage suits from other neighboring tribes with an interest in the outcome of the

application. Without commenting on their legal rights to do so, such a decision could delay the process substantially, perhaps interminably.

Moreover, ordering consultation could place Defendant in an untenable position. The Court is aware that Plaintiff is not bound by the terms of the Settlement Agreement and that it is "free to challenge administrative decisions that emerge from the process." Sokaogon Chippewa Community, 214 F.3d at 949. However, ordering renewed consultation under IGRA could, as a practical matter, force Defendant to violate the terms of the agreement to which he is a party. The court approved settlement agreement expressly provides that,

> [t]he determination on the issue of detriment to the surrounding community under 25 U.S.C. § 2719(b) will be based upon facts set forth in the administrative record as it existed on July 14, 1995, as supplemented only by: (1) any additional information submitted as part of consultations between the plaintiff Tribes and Interior as provided for herein; and (2) the supplemental documentation submitted in accordance with the provisions of paragraph 10 of this Settlement Agreement.

(Settlement Agreement § 8(b) (emphasis added).) Under paragraph 10 of the Settlement Agreement,

> [a]fter any required consultations between Interior and the applicant tribes, the draft supplement will be published and a public comment period of thirty days will be provided. The plaintiff Tribes agree that information developed through the NEPA process will be added will be added to the administrative record. Interior agrees not to solicit or consider public comments except through publication of the supplement as provided for above. Within thirty days of the close of the public comment period, Interior will consult with the plaintiff Tribes with respect to matters arising during the NEPA process in accordance with paragraph 12 of the Settlement Agreement. The record will be closed after completion of this consultation process.

(Id. at ¶ 10(a).) If the Court orders consultation in seeming contravention with the settlement agreement, Defendant could be found in violation of that agreement. For obvious reasons, this is something the Court is loath to do. Accordingly, the Court finds that this prong weighs in favor of denying the injunction.

4. Public Interest.

For the reasons discussed directly above, the Court finds that the public interest prong weighs in favor of denying injunctive relief. Perhaps most important, imposing a preliminary injunction could require Defendant to act in violation of the settlement agreement. Again, the Court is extremely hesitant to place Defendant in such a position. Moreover, the public has an identifiable interest in the preservation of the integrity of the judicial system. Essentially ordering Defendant to violate a court approved settlement agreement would severely undermine this interest. Finally, the applicant tribes have waited an inordinate amount of time for a determination on their application. Their interest in this matter surely weighs in favor of a denial of injunctive relief.

In sum, the Court finds that the balance of equities weighs heavily in favor of denying injunctive relief. Plaintiff's motion is accordingly denied.

**CONCLUSION**

For the foregoing reasons, and upon all of the files, records, and proceedings herein, the Court denies Defendant's Motion to Dismiss and denies Plaintiff's Motion for Preliminary Injunction.

Accordingly, **IT IS HEREBY ORDERED** that:

1. Defendant's Motion to Dismiss (Clerk Doc. No. 5) is **DENIED**; and

2. Plaintiff's Motion for Preliminary Injunction (Clerk Doc. No. 12) is **DENIED**.

Dated: October 30, 2000

Paul A. Magnuson
United States District Court Judge